1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

RUBEN MITCHELL,
          Petitioner,
    v.

MICHAEL MARTEL, Warden,
          Respondent.

Case No.  20-04294 BLF (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK**

Petitioner has filed a *pro se* amended petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his 2016 criminal conviction.  Dkt. No. 6 ("Amended Petition").  Respondent filed an answer on the merits.  Dkt. No. 12 ("Answer").  Petitioner did not file a traverse, although given an opportunity to do so.  For the reasons set forth below, the petition is **DENIED**.

## I.  BACKGROUND

A jury convicted Petitioner of kidnapping (count 1); assault with a firearm (count 2); torture (count 3); rape by a foreign object acting in concert (count 4); assault with a deadly weapon, a hunting knife (count 5); attempted pandering by procuring (count 6); and human trafficking for commercial sex (count 7).[1]  *See* Dkt. No. 21 at 46-50; Dkt. No. 21-2 at 2-5; *see also* Cal. Pen. Code, §§ 206, 207, 236.1(b), 245(a)(1)-(2), 264.1, 266i(a)(1), 289(a).

---

[1] Petitioner was tried with two co-defendants, Paul Booker and Jason Beasley.

Petitioner was sentenced to 45 years to life in state prison, comprised of 25 years to life on count 4 (penetration with a foreign object acting in concert), 20 years on count 7 (human trafficking), and a life term on count 3 (torture).  Dkt. No. 21-1 at 11.

On May 14, 2019, the California Court of Appeal ("state appellate court") affirmed the judgment.  *See* Dkt. No. 30-2 at 242-65; *see also People v. Mitchell*, No. A150156, A150433, 2019 WL 2098789 (Cal. Ct. App. May 14, 2019) (unpublished).  On August 21, 2019, the California Supreme Court summarily denied a petition for review. Dkt. No. 30-2 at 339.

When the last state court to adjudicate a federal constitutional claim on the merits does not provide an explanation for the denial," the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale."  *Wilson v. Sellers*, ––– U.S. ––––, 138 S.Ct. 1188, 1192 (2018).  "It should then presume that the unexplained decision adopted the same reasoning." *Id.*  Here, the California Supreme Court did not provide an explanation for its denial of the petition for review.  *See* Dkt. No. 30-2 at 339.  Petitioner did not argue that the California Supreme Court relied on different grounds than the state appellate court.  *See generally,* Am. Pet. Accordingly, this Court will "look through" the California Supreme Court's decision to the state appellate court's decision.  *See Skidmore v. Lizarraga*, No. 14-CV-04222-BLF, 2019 WL 1245150, at *7 (N.D. Cal. Mar. 18, 2019) (applying *Wilson*).

Petitioner filed the instant federal habeas petition on June 29, 2020 and is proceeding on an amended petition filed on September 9, 2020.  *See* Dkt. Nos. 1, 6. Petitioner does not present his arguments in the Amended Petition.  Instead, he submits and relies on his briefs filed in the California Court of Appeal and the California Supreme Court.  *See generally*, Am. Pet. (Dkt. No. 6 at 33-80; Dkt. No. 6-1 at 1-74).

## II.  STATEMENT OF FACTS

The following background facts are from the opinion of the state appellate court on direct appeal:

*Trial Overview*

A. Prosecution Evidence

In May 2013, Booker and Beasley were pimps in Oakland. Beasley and Mitchell were rap artists, and appeared in a music video together. 17-year-old Jane Doe was a prostitute in Oakland. Doe did not have a pimp but knew of pimps in the area, including Booker and Beasley. Booker wanted Doe to "prostitute for him" but she refused.

On June 2, 2013, Doe and Beasley "hung out" and had sex. The next day, Beasley planned to drive Doe "out of town," where she would work as a prostitute. Doe, however, changed her mind and asked Beasley to drop her off near her house. Beasley did not drop Doe off. Instead, he took her to several other locations, eventually stopping the car on an isolated road, near a corner where Booker was standing with three or four men, including Mitchell. One man saw Doe and said, " 'There goes that bitch.' " The men pointed at Doe. Then they got into a car.

Beasley drove away, but shortly thereafter, Booker's car arrived. Booker, Mitchell, and others got out of the car and approached Beasley's car. Booker had a Glock handgun. Booker and the other men dragged Doe out of Beasley's car. Doe screamed for help, but Beasley did not assist her. Doe felt Beasley had set her up because he let the men drag her out of the car.

Booker "beat [Doe] up" with his gun, striking her multiple times in the face. Doe's "head was busted" and she lost "so much blood." Booker also put his gun in Doe's mouth and told her to " '[s]hut up.' " Then he and several other men grabbed Doe by her hair and threw her in the trunk. The car stopped at Booker's apartment, and Booker dragged Doe inside.

There were "a lot of people" in the apartment, including defendants. [FN 2] People in the apartment were "talking shit" to Doe; Mitchell and others told Doe she "should have just been a ho[]" and Mitchell screamed, " 'Why don't you just ho[.]' " Doe was thrown to the ground and hit several times. As she was beaten, the men told her: "You gotta make money for us[.]" Then Doe "blacked out." When she regained consciousness, her neck, arms, and legs were bound with duct tape. A makeshift blindfold had been placed over her head, but it came off. Booker and another man "started cutting" Doe with a machete, first on her breast, then on her back, leg, and stomach.

> [FN 2] Doe told the police Mitchell was in the apartment. At trial, Doe identified a photograph of Mitchell, but she could not identify him in the

United States District Court
Northern District of California

courtroom because he was wearing glasses and he had changed his hairstyle. As Doe and Mitchell were being transported to court during trial, Doe identified Mitchell. She told the sheriff's deputy " 'That's the guy that did this to me. That's the guy that raped me[,]' " and the deputy confirmed it was Mitchell. At one point during her trial testimony, Doe said she thought Mitchell "was just sitting on the couch," in the apartment, but acknowledged she could not "remember all of the details" about the ordeal.

Booker said, " 'Bitch, you gone [sic] make my money' " and " 'I am going to kill you bitch if you don't make my money.' " Booker put his gun in Doe's vagina and threatened to kill her if she screamed, saying " 'My trigger finger is itching.' " Beasley watched. He did not help Doe.

Doe drifted in and out of consciousness. Her head was "busted open" and she was "losing a lot of blood." Doe's eyes were swollen shut. She awoke in a bedroom—"naked and cut up"—on top of black garbage bags. She was still duct taped, but "there was so much blood that [her] arms got loose[.]" Doe removed a window screen and jumped out of a window. Still naked, Doe made her way to a nearby driveway and hid underneath a parked car. A man saw Doe, gave her a shirt, and called the police. The man told the police that two men with guns had been looking for Doe, and identified Booker as one of the men.

About five minutes later, the police arrived and found Doe under the car. She was "terrified. She was very, very scared and kept asking [the police officer] to get her out of there." Doe begged the officer to help her and said a man was "trying to kill [her]" and that he lived nearby. Doe's face was swollen and bleeding. She had duct tape around her neck. Doe showed the police the car used to kidnap her and the apartment where she was held. She gave the police the name "Paul," identified Booker's picture, and said he had been "seeking her to prostitute for him" and that he tried to kill her. Doe also told the police someone was "looking for her" and that "these guys had lots of guns." [FN 3] Doe was taken to the hospital, where she gave a statement. She was "very shaken, very upset." A medical examination confirmed Doe's account of her injuries.

[FN 3] The court admitted a recording from a police officer's body camera. When she gave the police a statement, Doe lied about various details because she was afraid.

The car used to kidnap Doe belonged to Booker. In the apartment, police found a box containing Booker's wallet and personal documents, including his birth certificate. Police also found a roll of duct tape, black trash bags, a long-bladed knife,

and Glock handgun ammunition. In a bedroom, there was blood on a window sill. The window screen was on the ground, below the window.

Latent prints were found on an inside layer of the duct tape used to secure Doe's blindfold. Seven prints "were of sufficient quality and quantity" and had "enough unique detail" to be presented to a fingerprint examiner. Some of the prints were palm prints. Kimberly Lankford, a latent print examiner, identified one of the palm prints as belonging to Mitchell. Another criminalist verified Lankford's identification.

Shortly before trial, Beasley asked Doe: "Please don't snitch on me. Don't tell on me."

B. Defense Evidence

Ralph Haber, Ph.D., testified as an expert for Mitchell regarding fingerprint identification. He stated the latent print matched to Mitchell lacked "many reliable features" and was "harder to justify . . . as a palm rather than just a piece of a fingerprint." Dr. Haber opined the "print that was lifted wasn't good enough" to make an identification. He did not analyze the print himself; he did not attempt to verify Lankford's work. Dr. Haber acknowledged the Oakland Police Department crime lab is accredited and that he had not reviewed the process the lab used to verify prints.

The court admitted a 2014 booking photo of Mitchell with no face tattoo. A witness for Beasley corroborated Doe's description of the abduction and identified Mitchell as one of the armed kidnappers. The witness claimed she and Beasley went to a restaurant after Doe was abducted.

*Verdict and Sentence*

In September 2016, the jury convicted Booker and Mitchell of the lesser included offense of kidnapping on count 1 and counts 2, 3, 4, 5, 6, and 7. . . .

In December 2016, the court sentenced defendants. . . . [¶] The court sentenced Mitchell to 45 years to life in state prison, comprised of 25 years to life on count 4 (penetration with a foreign object acting in concert), 20 years on count 7 (human trafficking), and a life term on count 3 (torture). . . .

After defendants appealed, the trial court amended Booker and Mitchell's respective abstracts of judgment to correct minor sentencing errors. . . .

*Mitchell*, 2019 WL 2098789, at *1–3.

# III.  DISCUSSION

## A.    Legal Standard

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Rose v. Hodges*, 423 U.S. 19, 21 (1975).  The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. *Id.* at 412; *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004).  While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir.), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme

United States District Court
Northern District of California

Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413.  "Under § 2254(d)(1)'s 'unreasonable application' clause, . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

**B.    Claims and Analyses**

Petitioner raises the following claims in this federal habeas petition:

(1) the trial court erred by restricting defense counsel's presentation of the defense theory during closing argument;

(2) the trial court abused its discretion by restricting Petitioner's expert testimony on palm print examinations;

(3) the trial court erred by instructing the jury erroneously on the mens rea element of human trafficking;

(4) the trial court erred by failing to instruct the jury on false imprisonment (Cal. Pen. Code, § 236) as a lesser included offense to human trafficking (Cal. Pen. Code, § 236.1(b));

(5) the trial court erred by failing to stay Petitioner's sentence for human trafficking because that offense was a part of an indivisible course of conduct with the forcible penetration and torture counts (counts 3 and 4); and

(6) cumulative error.[2]

---

[2] The Amended Petition also identifies the following two claims: (1) resentencing was required on counts 2 and 5 because the trial court orally stated it was imposing the midterm but announced the aggravated term; and (2) Petitioner is entitled to 93 days of presentence conduct credit. *See* Am. Pet. (Dkt. No. 6 at 7-8).  However, the record reflects that Petitioner's state appellate counsel submitted a letter in the state appellate court withdrawing these claims. *See* Dkt. No. 30-2 at 108. A claim is not exhausted where a state

1.   **Restriction on Defense Theory During Closing Argument**

   **a.  Relevant Facts**

During closing argument, the trial court sustained an objection to defense counsel's argument relating to the origin and timing of a photograph of Petitioner.  The defense theory was that Petitioner was not the man in the apartment that was identified by Jane Doe because, unlike that man, Petitioner did not have a face tattoo at that time.  Petitioner claims that the court significantly restricted presentation of this defense theory and thereby rendered his counsel ineffective.  *See* Am. Pet., Ex. A at 65-70.

The facts underlying this claim, as summarized by the state appellate court, are as follows:

> After the incident, Doe told the police Mitchell was at the apartment. At trial, she testified one person in the apartment had a face tattoo. She testified the man said she "should have just been a ho[ ]." Doe did not identify Mitchell at trial because he was wearing glasses and had a different hair style. She did, however, identify Mitchell's picture. Doe also recognized Mitchell as they were being transported to court; she told a sheriff's deputy " '[t]hat's the guy that did this to me. That's the guy that raped me.' " At the time of trial, Mitchell had a tattoo over his left eyebrow.
>
> The court admitted a 2014 booking photograph depicting Mitchell without a face tattoo, authenticated by an affidavit from the sheriff's office. The exhibit also included defense counsel's subpoena for the booking photograph. During closing argument,

---

prisoner presents it in a habeas petition with a court but later withdraws it from consideration. *See Fierro v. Domingo*, 2011 WL 7473763 at *3 (C.D. Cal. Oct. 3, 2011) (holding habeas claims unexhausted where a petitioner withdrew his California Supreme Court petition before it ruled on the merits). It thus appears that Petitioner has not given the state courts a "full and fair opportunity to resolve federal constitutional claims before those claims [were] presented to the federal courts." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  Because neither the state appellate court nor the California Supreme Court ruled on these claims, this Court concludes that they are unexhausted. In such circumstances, the district court must dismiss the petition. *See Rose v. Lundy*, 455 U.S. 509, 522 (1982).  But where an unexhausted claim lacks merit, the district court may deny the mixed petition. *See* 28 U.S.C. § 2254(b)(2).  Here, the two unexhausted claims are moot because the state trial court granted the requested relief. *See* Dkt. No. 30-2 at 91-92. Thus, these two claims are DENIED.

1   defense counsel displayed a copy of the exhibit and stated: "This
    is a photo of Mr. Mitchell from March 14th, 2014.... There's his
2   face with no tattoo. That photo is here as a result of a subpoena
    that I sent to the ... Sheriff's Office. I asked them pursuant to
3   court order to send me a ... booking photograph of [Mitchell]
    from 2014."

4   The prosecutor objected, and the court sustained the objection.
    It noted "[t]he document speaks for itself. You can't say that.
5   There's no testimony to that. You just have something on the
    document." Defense counsel continued, "The ... photograph is
6   dated ... 2014. In that photograph you can see that there is no
    tattoo. [¶] If there is no tattoo in 2014, then there is no tattoo on
7   his face [on] June 3, 2013." Counsel argued Mitchell was not the
    man in the apartment with the face tattoo and urged the jury to
8   reject the testimony of Beasley's witness, who identified
    Mitchell as one of the kidnappers.

9
    In rebuttal, the prosecutor urged the jury to look at the exhibit
10  "and make your own determinations. The problem with it is that
    ... Doe [is] not identifying someone off of a face tattoo. It's not I
11  remember the face tattoo forever. ... She said he looks different
    because of the hair because I remember dreadlocks and I don't
12  remember glasses. Two things he didn't have when he was seen
    in custody by ... Doe. [¶] ... [¶] So anything in regards to the face
13  tattoo ... without any questions being asked of her in terms of
    why there may be a discrepancy is just a red herring and trying
14  to distract you. When you look at the evidence and look at what
    she said, she knew it was him. She knew it was him and that he
15  changed his looks to make sure that she didn't come in and see
    him again."
16
    *Mitchell*, 2019 WL 2098789, at *8.
17
                    **b.   The State Appellate Court's Rejection of This Claim**
18
          The state appellate court rejected Petitioner's claim that the trial court's ruling
19
    violated Petitioner's due process rights, holding that any alleged error was harmless:
20
            Mitchell claims the "court's refusal to allow defense counsel to
21          make a closing argument based on crucial defense evidence,
            which identified the origin of the booking photograph and
22          established its reliability as a photograph taken after the date of
            the offense, deeply undermined [his] defense." "A criminal
23          defendant has a well-established constitutional right to have
            counsel present closing argument to the trier of fact. [Citation.]
24          '[The] right is not unbounded, however; the trial court retains
            discretion to impose reasonable time limits and to ensure that
25          argument does not stray unduly from the mark.' " (*People v.
            Benavides* (2005) 35 Cal.4th 69, 110.)
26

27

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

> At oral argument, the Attorney General acknowledged that restricting defense counsel from commenting on the origin of the exhibit may have been erroneous, but that any error was harmless. We agree any assumed error was harmless beyond a reasonable doubt. (*Chapman v. California*, supra, 386 U.S. at p. 24.) The court admitted the exhibit—which contained the booking photograph, the sheriff's affidavit, and defense counsel's subpoena—into evidence. It allowed defense counsel to make his central point: that Mitchell did not have a face tattoo in 2013 and, as a result, he was not the person with the face tattoo Doe saw in the apartment. (*See People v. Marshall* (1996) 13 Cal.4th 799, 853–854.) The evidence supporting Mitchell's convictions was strong: Doe testified Mitchell was at the apartment when she was tortured. As Doe and Mitchell were being transported to court for trial, Doe told a sheriff's deputy " '[t]hat's the guy that raped me' " and the deputy confirmed it was Mitchell. Beasley's witness identified Mitchell as one of the armed kidnappers, and Mitchell's palm print was found on an inner layer of duct tape used to bind Doe's blindfold. Precluding defense counsel from describing the methods used to obtain the exhibit was harmless beyond a reasonable doubt.

*Mitchell*, 2019 WL 2098789, at *9.

### c. Analysis

Although complete denial of an opportunity to make a closing argument violates a defendant's constitutional rights, *Herring v. New York*, 422 U.S. 853, 858-65 (1975), the Supreme Court has held that *Herring* "did not clearly establish that the *restriction* of summation also amounts to structural error."  *Glebe v. Frost*, 574 U.S. 21, 24 (2014) (emphasis in original).  "In the absence of ' "the rare type of error" ' that requires automatic reversal, relief is appropriate only if the prosecution cannot demonstrate harmlessness."  *Davis v. Ayala*, 576 U.S. 257, 267 (2015).  The harmlessness analysis on a petition for writ of habeas corpus mandates that a petitioner is not entitled to relief "unless they can establish that [the alleged error] resulted in 'actual prejudice.' "  *Id.*; *Brecht v. Abrahamson*, 507 U.S. 619 (1993).  "Under this test, relief is proper only if the federal court has ' "grave doubt about whether a trial error of federal law had "substantial and injurious effect or influence in determining the jury's verdict." ' [Citation.] There must be more than a ' "reasonable possibility" ' that the error was harmful."  *Davis*, *supra*, at 267.

1

2

3

4

5

6

     Assuming, as the state appellate court did, that the trial court's restriction on defense counsel's closing argument was error, Petitioner has not demonstrated actual prejudice.  As an initial matter, the record reflects that Petitioner's counsel *did* argue the defense theory: "The [photograph] is dated . . . September 14th, 2014.  In that photograph you can see that there is no tattoo.  If there is no tattoo in 2014, then there is no tattoo on his face June 3rd, 2013." Dkt. No. 28-1 at 58-59.

7

8

9

10

11

12

13

14

15

16

17

18

     Moreover, there was strong evidence supporting the jury's finding that Petitioner was involved in the kidnapping and torture of the victim.  First, the victim herself testified that Petitioner was one of the assailants in the apartment. Dkt. No. 22 at 83-84, 90. Initially, she had indicated during a photo lineup that Petitioner looked familiar, but she was not certain if he was involved.  *Id.*  Shortly before trial, however, she encountered him at the courthouse, causing her to run away frightened because she recognized him as one of the men involved in the incident. *Id.* at 133. After seeing him in-person, she testified that she was "sure" he was involved.  *Id.* at 83-84. Next, a witness for one of Petitioner's co-defendants testified that she recognized Petitioner when he got out of the car to kidnap the victim. Dkt. No. 27 at 86-87. And lastly, the prosecution's fingerprint expert testified that Petitioner's palm print was found on the duct tape used to bind the victim's blindfold.  *See* Dkt. No. 25 at 82-84.

19

20

21

22

23

24

25

26

     Considering this evidence, any error in restricting defense counsel's argument regarding the origin and timing of Petitioner's photograph did not have a "substantial and injurious effect" on the verdict.  *See Dillard v. Roe*, 244 F.3d 758, 769–70 (9th Cir. 2001), *amended on denial of reh'g* (May 17, 2001) ("Even if we assume, without deciding, that the trial court [committed constitutional error], that ruling could not have had a 'substantial and injurious effect or influence in determining the jury's verdict.' . . .  There was an abundance of other, uncontradicted evidence that Dillard had suffered the convictions alleged.") (citations omitted).

27

28

Case No. 20-04294 BLF (PR)
ORDER DEN. PET. FOR WRIT OF HABEAS CORPUS; DEN. CERTIFICATE OF APPEALABILITY

Based on the foregoing, the state appellate court's rejection of Petitioner's first claim was reasonable and is therefore entitled to AEDPA deference.  Accordingly, this claim is DENIED.

### 2.     Restrictions on Petitioner's Expert

#### a.  Relevant Facts

Petitioner next argues that the trial court violated his due process rights by placing certain restrictions on his expert.  The facts underlying this claim, as summarized by the state appellate court, are as follows:

> Mitchell requested Dr. Haber be present when Lankford, the prosecution's fingerprint expert, testified because Dr. Haber would address Lankford's "analysis and conclusions." The prosecutor objected, arguing the jury would "determine the credibility ... [and] quality of the investigation. It's not for someone else to sit in the courtroom and then listen or adjust their testimony to try to impede on that function of the jury." The court denied Mitchell's request.
>
> . . .
>
> Mitchell [also] sought to qualify Dr. Haber as an expert in several areas, including rates of erroneous fingerprint identification. During voir dire, Dr. Haber acknowledged he did not analyze the fingerprints—instead he accepted Lankford's analysis. The court determined Dr. Haber was "not an expert in the area of erroneous rates. . . . He's critiquing other people's opinions about what they've done." Dr. Haber testified the palm print attributed to Mitchell "wasn't good enough" to make a reliable identification.

*Mitchell*, 2019 WL 2098789, at *5-6.

#### b.  State Appellate Court's Rejection of This Claim

The state appellate court rejected Petitioner's claim that the trial court's rulings violated Petitioner's due process rights:

> A. No Error in Excluding Dr. Haber from the Courtroom While Lankford Testified
>
> . . .
>
> A trial court has discretion to exclude witnesses, including experts, from the courtroom while other witnesses testify.

United States District Court
Northern District of California

(*People v. Roybal* (1998) 19 Cal.4th 481, 511; Evid. Code, § 777.) The purpose of this rule "is to prevent tailored testimony and aid in the detection of less than candid testimony." (*People v. Valdez* (1986) 177 Cal.App.3d 680, 687.) Here, the court did not abuse its discretion by excluding Dr. Haber from the courtroom while Lankford testified, notwithstanding Mitchell's claim that he articulated a "legitimate purpose" for authorizing Dr. Haber's presence. (*Roybal*, supra, at pp. 510–511; *Valdez*, at p. 687.) Mitchell's reliance on cases from other jurisdictions does not alter our conclusion. (*See People v. Waxler* (2014) 224 Cal.App.4th 712, 723.)

B. No Error in Restricting the Scope of Dr. Haber's Expert Testimony

. . .

Precluding Dr. Haber from offering expert testimony on erroneous fingerprint identification rates was not an abuse of discretion. The court permitted defense counsel to question Dr. Haber about error rates, and allowed him to criticize the reliability of Lankford's identification. (*People v. DeHoyos* (2013) 57 Cal.4th 79, 128 [no abuse of discretion in restricting scope of expert testimony].) Even if the court erred, the error is harmless because it is not reasonably probable Mitchell would have achieved a more favorable result had the court qualified Dr. Haber as an expert in the area of fingerprint identification error rates.

*Mitchell*, 2019 WL 2098789, at *5-6.

### c. Analysis

To the extent that Petitioner's claim merely involves the trial court's purported misapplication of California's evidentiary rules, the claim fails because it involves only an alleged error in state law. "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991); *see also* 28 U.S.C. § 2254(a). Habeas relief is not available for an alleged error in the interpretation or application of state law. *Estelle*, 502 U.S. at 68.

As applied here, this law precludes Petitioner's challenge to three of the trial court's rulings concerning Dr. Haber. The trial court first denied Petitioner's request that Dr. Haber be present during the prosecution expert witness's testimony. Dkt. No. 21-3 at 31-

32. Pursuant to California Evidence Code § 777[3], the court stated that it would not be "fair to anybody" to have Dr. Haber tailor his testimony to that of another witness.  The trial court then determined that Dr. Haber was unqualified to testify as an expert on error rates because he had merely "critique[ed] other people's opinions about what they've done." Dkt. No. 26 at 17. The trial court did, however, permit Dr. Haber to testify on error rates as a non-expert. And lastly, the trial court held that Dr. Haber could not testify about recertification requirements for latent print examiners due to lack of foundation.[4]

The Ninth Circuit has made clear that state law issues of admissibility and foundation are not cognizable on federal habeas review. *See Johnson v. Sublett*, 63 F.3d 926, 931 (9th Cir. 1995) (denying habeas relief based on claim that admission of wooden clubs found at defendant's house was unconstitutional due to lack of evidence linking clubs to crimes because claim merely "present[ed] state-law foundation and admissibility"). Thus, even accepting Petitioner's argument that the trial court erred, those purported errors would not entitle Petitioner to habeas relief.  In any event, the state appellate court held that the trial court did not err under state law and that any alleged error was harmless.  This Court is bound by the state appellate court's interpretation of state law.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam) (stating that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus").

Furthermore, the fact that petitioner has invoked his rights under the Fifth and Sixth Amendments does not render his otherwise state evidentiary claim a cognizable federal claim. A federal habeas petitioner may not transform a state-law issue into a federal one

---

[3] This statute provides, in relevant part, that "the court may exclude from the courtroom any witness not at the time under examination so that such witness cannot hear the testimony of other witnesses."  Cal. Evid. Code, § 777(a).

[4] The state appellate court did not address this third claim of error, even though Petitioner presented it on appeal.  "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011).

merely by making a general appeal to a constitutional guarantee, such as the right to due process. *See Gray v. Netherland*, 518 U.S. 152, 163 (1996). For this reason, the Ninth Circuit repeatedly has held that a habeas petitioner's mere reference to the Due Process Clause is insufficient to render his claims viable under the Fourteenth Amendment. *See Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994); *Miller v. Stagner*, 757 F.2d 988, 993-94 (9th Cir. 1985).

Regardless, even if Petitioner had asserted a cognizable challenge to the trial court's decisions, that challenge would not entitle Petitioner to habeas relief. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' " *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)) (citations omitted); *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). But the right to present relevant evidence is subject to reasonable restrictions, such as state evidentiary rules. *Moses v. Payne*, 555 F.3d 742, 757 (9th Cir. 2009); *see also LaJoie v. Thompson*, 217 F.3d 663, 668 (9th Cir. 2000) (observing that right to present evidence in criminal case " 'may, in appropriate circumstances, bow to accommodate other legitimate interests in the criminal trial process' ") (quoting *Michigan v. Lucas*, 500 U.S. 145, 149 (1991)). Indeed, "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' <u>or</u> 'disproportionate to the purposes they are designed to serve.' " *Green v. Lambert*, 288 F.3d 1081, 1090 (9th Cir. 2002) (quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1998)) (emphasis in original). The Supreme Court, moreover, has "indicated its approval of 'well-established rules of evidence [that] permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or

United States District Court
Northern District of California

potential to mislead the jury.' " *Moses*, 555 F.3d at 757 (quoting *Holmes v. South Carolina*, 547 U.S. 319, 326 (2006)).

The Ninth Circuit has observed that "[t]he Supreme Court has found a violation of the right to present a complete defense [only] in cases where a state evidentiary rule, on its face, 'significantly undermined fundamental elements of the defendant's defense,' but did little or nothing to promote a legitimate state interest." *United States v. Pineda-Doval*, 614 F.3d 1019, 1033 n.7 (9th Cir. 2010) (emphasis added). Specifically, the Supreme Court has struck down rules that "preclude[ ] a defendant from testifying, exclude[ ] testimony from key percipient witnesses, or exclude[ ] the introduction of all evidence relating to a crucial defense." *Moses*, 555 F.3d at 758.

None of the trial court's challenged rulings was made under any rule that falls into any of the categories of evidentiary rules struck down by the Supreme Court. Petitioner's challenge here is, in essence, a challenge to the way the trial court exercised its discretion. Under AEDPA, such a claim must fail because the Supreme Court has not squarely addressed whether a trial court's exclusion of witnesses or evidence under a rule requiring it to "balance factors and exercise its discretion" may violate due process, nor has it established a "controlling legal standard" for evaluating such discretionary decisions. *Moses*, 555 F.3d at 758-60; *see Brown v. Horell*, 644 F.3d 969, 983 (9th Cir. 2011) (noting that, since the Ninth Circuit issued its opinion in *Moses*, "the Supreme Court has not decided any case either 'squarely address[ing]' the discretionary exclusion of evidence and the right to present a complete defense or 'establish[ing] a controlling legal standard' for evaluating such exclusions."). In the absence of any such Supreme Court precedent, the state appellate court's decision upholding the trial court's exercise of its discretion cannot be contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. *Moses*, 555 F.3d at 760; *see Carey v. Musladin*, 549 U.S. 70, 77 (2006) (where Supreme Court precedent gives no clear answer to question

1   presented, "it cannot be said that the state court 'unreasonab[ly] appli[ed] clearly

2   established Federal law' ").  Accordingly, this claim is also DENIED.

3       **3.  Instructional Error**

4         **a.  Relevant Facts**

5       Petitioner further claims that the jury was improperly instructed on the intent

6   element in the human trafficking instruction, in violation of his due process rights.  The

7   state appellate court summarized the facts underlying this claim as follows:

8         The elements of human trafficking are "(1) the defendant either
deprived another person of personal liberty or violated that other

9         person's personal liberty; and (2) when the defendant did so, he
... intended to obtain forced labor or services from that person."

10        (*People v. Halim* (2017) 14 Cal.App.5th 632, 643.)

11        Here, the second element of the jury instruction—a modification
of CALCRIM No. 1243—stated: "[w]hen the defendant acted,

12        *the other person* intended to maintain a violation of ... [section]
266h or 266i." (Italics added.) Defendants argue the human

13        trafficking conviction must be reversed because the instruction
did not require the jury to find defendants possessed the requisite

14        intent.

15  *Mitchell*, 2019 WL 2098789, at *6.

16      **b.  State Appellate Court's Rejection of This Claim**

17      The state appellate court acknowledged the typographical error in the jury

18  instruction but held that it was harmless:

19        We conclude the error was harmless beyond a reasonable doubt
because it "did not contribute to the jury's verdict." (*People v.*

20        *Cole* (2004) 33 Cal.4th 1158, 1208; *Chapman v. California*
(1967) 386 U.S. 18, 24.) The evidence established defendants

21        had the present intent to force Doe to work as a prostitute: Doe
testified Booker was attempting to force her to work as a

22        prostitute and statements Booker and Mitchell made in the
apartment corroborated Doe's testimony—Mitchell and others

23        told Doe she needed to "make money for us" and Booker
threatened to kill Doe if she did not "make ... money" for him.

24        Even with the typographical error, a logical reading of the
instruction required the jury to find defendants had the intent to

25        obtain forced labor or services from Doe. The jury recognized
the instruction as written was illogical; its verdict on the human

26        trafficking charge—based on overwhelming evidence—

27

28

establishes the error in the jury instruction was of no consequence.

In an effort to establish they lacked the intent to force Doe to work as a prostitute, defendants rely on Doe's testimony that about a week before the incident, Booker wanted Doe to "prostitute for him" but she refused. Defendants claim this testimony shows they "did not attempt to influence Doe's future conduct, but instead sought to exact retribution for Doe's earlier refusal to engage in prostitution." We are not persuaded this evidence would lead a rational juror to conclude defendants lacked the present intent to influence Doe to be a prostitute. Two additional factors persuade us the error in the jury instruction was harmless beyond a reasonable doubt: (1) the court instructed the jury with CALCRIM No. 252 (union of act and intent: general and specific intent together), which informed the jury that human trafficking required a finding of specific intent; and (2) the jury convicted defendants of attempted pandering, which required a finding that defendants possessed the intent to effect or maintain a violation of the pandering statute.

We conclude the instructional error was harmless beyond a reasonable doubt. (*People v. Jurado* (2006) 38 Cal.4th 72, 123 [omission of intent element in jury instruction was harmless beyond a reasonable doubt]; *People v. Sakarias* (2000) 22 Cal.4th 596, 625 [affirming notwithstanding instructional error where jury "could not have rationally found the omitted element unproven"].)

*Mitchell*, 2019 WL 2098789, at *6-7.

### c. Analysis

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. *See Estelle*, 502 U.S. at 72; *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'"). The instruction may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record. *See Estelle*, 502 U.S. at 72. In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. *United States v. Frady*, 456 U.S. 152, 169 (1982) (citing

United States District Court
Northern District of California

*Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)); *see, e.g.*, *Middleton v. McNeil*, 541 U.S. 433, 434-35 (2004) (per curiam) (no reasonable likelihood that jury misled by single contrary instruction on imperfect self-defense defining "imminent peril" where three other instructions correctly stated the law); *cf. Chambers v. McDaniel*, 549 F.3d 1191, 1199-00 (9th Cir. 2008) (finding constitutional error where, in addition to erroneous instruction on premeditation, murder instructions as a whole and state's emphasis on erroneous instruction in closing argument allowed jury to convict petitioner of first-degree murder without finding separately all elements of the crime); *see also United States v. Rodriguez*, 971 F.3d 1005, 1012-13 (9th Cir. 2020) (in a federal criminal appeal, holding that even if the district court had erred in some discussion of the jury instructions, it "used [defendant's] preferred formulation where it mattered, i.e., in laying out the elements of the offense," and so there was "no reversible error when the jury instructions are considered 'as a whole'") (citation omitted); *Ross v. Davis*, 29 F.4th 1028, 1045 (9th Cir. 2022) (in capital case, state court's determination that erroneous aider or abettor instruction was harmless was not unreasonable because, as state court found, the specific intent culpability requirement was encompassed under alternative instruction).

Petitioner is not entitled to relief on this claim because he has not shown that the CALCRIM No. 1243 instructional error so infected the entire trial that the resulting conviction violates due process.  As the state appellate court noted, there was ample evidence that Petitioner possessed a present intent to induce the victim to prostitute.  The victim testified that both of Petitioner's co-defendants tried to force her to prostitute for them; the men in the apartment kept telling the victim, "You gotta make money for us"; and Petitioner himself told her, "why don't you just ho[ ]." Dkt. No. 22 at 116, 140. Moreover, the erroneous instruction was given along with CALCRIM No. 1151 (pandering), which required a showing that, among other things, "The defendant intended to influence Jane Doe to be a prostitute."  Dkt. No. 16 at 33. As Petitioner was convicted of

1    attempted pandering, this necessarily required a finding by the jury that Petitioner had the

2    present intent to influence the victim to be a prostitute.  Even further, the prosecutor

3    explained during closing argument that human trafficking has two elements: "[D]id he

4    deprive personal liberty of another with specific intent to effect or maintain a violation of

5    pimping or pandering." Dkt. No. 36 at 62. As to the second element, the prosecutor noted

6    that this gets to "the mindset of the defendant when they deprived someone of that liberty.

7    [¶] In other words, to put it simply for this case, human trafficking in this case is a question

8    of did the defendants kidnap Jane Doe with the intent to pimp or pander?"  *Id.* at 63.

9        This evidence, considered in toto, supports the jury's finding that Mitchell had the

10   requisite intent for the human trafficking conviction.  Accordingly, the state appellate

11   court's rejection of Petitioner's first claim was reasonable and is therefore entitled to

12   AEDPA deference.  This claim is DENIED.

13       **4.    False Imprisonment as a Lesser Included Offense**

14          **a.  Relevant Facts**

15       In his fourth claim, Petitioner asserts the trial court committed reversible error when

16   it failed to instruct on false imprisonment as a lesser included offense of human trafficking.

17   The facts underlying this claim, as summarized by the state appellate court, are as follows:

18          Booker and Mitchell claim the court erred by failing to instruct
            the jury on false imprisonment as a lesser included offense of
19          human trafficking. Misdemeanor false imprisonment has one
            element: the defendant committed an "unlawful violation of the
20          personal liberty of another." (§ 236.) A defendant who commits
            human trafficking necessarily commits misdemeanor false
21          imprisonment because he deprives or violates the personal
            liberty of another, with the intent to effect or maintain a violation
22          of the pandering statute. (§ 236.1.)

23   *Mitchell*, 2019 WL 2098789, at *7.

24          **b.  State Appellate Court's Rejection of This Claim**

25

26

27

28

United States District Court
Northern District of California

1
2
3

The state appellate court assumed that the failure to instruct on false imprisonment was error, but it held that Petitioner was not entitled to relief on this claim because the error was harmless:

4
5

> [¶] We assume misdemeanor false imprisonment is a lesser included offense of human trafficking, and that the court erred by failing to instruct on that lesser included offense.

6
7
8
9
10
11

> We conclude the jury's verdict on attempted pandering demonstrates the failure to instruct on false imprisonment was harmless. (*People v. Breverman* (1998) 19 Cal.4th 142, 178.) In convicting defendants of attempted pandering, the jury made the necessary finding to elevate misdemeanor false imprisonment to human trafficking—i.e., that defendants acted with the intent to violate the pandering statute. As a result, it is not reasonably probable Booker and Mitchell would have obtained a more favorable result had the jury been instructed with the lesser included offense.

12
13
14
15
16
17

> Booker and Mitchell claim they did not have the present intent to pander. This argument fails for the reasons discussed ante, and ignores the numerous statements Booker, Mitchell, and others made on the day of the incident establishing they held Doe against her will as a means to coerce her to prostitute herself. Booker acknowledges these statements are "some evidence of an intent to influence Doe that was contemporaneous with the ... kidnapping" and that Doe's testimony supported a conclusion that "her captors were animated by a desire to influence her to engage in prostitution[.]"

18
19

> Any assumed error in failing to instruct the jury on the lesser included offense of false imprisonment is harmless. (*People v. Beames* (2007) 40 Cal.4th 907, 928.)

20

*Mitchell*, 2019 WL 2098789, at *7.

### c. Analysis

21
22
23
24
25
26
27

The failure to instruct on a lesser-included offense in a capital case is constitutional error if there was evidence to support the instruction. *See Beck v. Alabama*, 447 U.S. 625, 638 (1980); *Turner v. Marshall*, 63 F.3d 807, 818 (9th Cir. 1995), *overruled on other grounds by Tolbert v. Page*, 182 F.3d 677, 685 (9th Cir. 1999) (en banc).  But the failure of a state trial court to instruct on lesser-included offenses in a non-capital case does not present a federal constitutional claim.  *See Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir.

United States District Court
Northern District of California

2000); *Windham v. Merkle*, 163 F.3d 1092, 1105-06 (9th Cir. 1998); *cf. Vickers v. Ricketts*, 798 F.2d 369, 371 (9th Cir. 1986) (where evidence supports lesser-included-offense instruction in capital case, due process requires that court give instruction sua sponte), *cert. denied*, 479 U.S. 1054 (1987).

In the absence of a clearly established federal constitutional right to a jury instruction on a lesser-included offense in a non-capital case, Petitioner's claim for relief fails. In addition, as discussed *supra*, there was ample evidence to support Petitioner's conviction for human trafficking. Petitioner is thus not entitled to relief on this claim.

### 5. Cumulative Error

Petitioner argues that the cumulative effect of the alleged constitutional errors discussed above violated his right to a fair trial. Dkt. No. 6-1 at 29-30. The state appellate court disagreed: "We also reject Mitchell's cumulative error argument. (*People v. Duff* (2014) 58 Cal.4th 527, 562.)" *Mitchell*, 2019 WL 2098789, at *3 fn. 4.

"Under traditional due process principles, cumulative error warrants habeas relief only where the errors have so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2017) (internal quotation marks omitted); *see McDowell v. Calderon*, 107 F.3d 1351, 1368 (9th Cir.) (cumulative effect of errors may deprive habeas petitioner of due process right to fair trial), *amended*, 116 F.3d 364 (9th Cir. 1997), *vacated in part by* 130 F.3d 833, 835 (9th Cir. 1997) (en banc). *See, e.g.*, *Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003) (reversing conviction where multiple constitutional errors hindered defendant's efforts to challenge every important element of proof offered by prosecution); *Thomas v. Hubbard*, 273 F.3d 1164, 1179-81 (9th Cir. 2002), *overruled on other grounds by Payton v. Woodford*, 299 F.3d 815, 829 n.11 (9th Cir. 2002) (reversing conviction based on cumulative prejudicial effect of (a) admission of triple hearsay statement providing only evidence that defendant had motive and access to murder weapon; (b) prosecutorial

misconduct in disclosing to the jury that defendant had committed prior crime with use of firearm; and (c) truncation of defense cross-examination of police officer, which prevented defense from adducing evidence that someone else may have committed the crime and evidence casting doubt on credibility of main prosecution witness); *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (prejudice resulting from cumulative effect of improper vouching by prosecutor, improper comment by prosecutor about defense counsel, and improper admission of evidence previously ruled inadmissible required reversal even though each error evaluated alone might not have warranted reversal).

In *Parle*, the Ninth Circuit affirmed a finding of cumulative error where the trial court committed multiple evidentiary errors that "went to the heart of the defense's case and the only issue before the jury." *Parle*, 505 F.3d at 924, 934. The court explained that "[a] unique and critical thread [ran] through the trial errors": all of the improperly excluded evidence in petitioner's case supported his defense that he lacked the requisite state of mind for first degree murder while all of the erroneously admitted evidence undermined his defense and credibility and bolstered the State's case. *Id.* at 930. The court found there was a "unique symmetry" of the evidentiary errors, which "starkly amplified" each other and which bore a "direct relation to the sole issue contested at trial," i.e., petitioner's state of mind at the time of the crime, rendering petitioner's defense " 'far less persuasive,' infecting his trial with unfairness and depriving him of due process." *Id.* at 932-34 (citations omitted).

A cumulative error claim is "rarely successful," *Smith v. Wasden*, 747 F. App'x 471, 478 (9th Cir. 2018), and where there is no "symmetry of error," habeas relief will not be granted. *See Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011). In *Ybarra*, for instance, the Ninth Circuit concluded that the claimed errors regarding the composition of the jury "did not amplify each other" and the claimed errors at sentencing did not have a "synergistic effect." Where "[t]he effect of the improper jury instruction was to focus the

jurors on the horrific nature of the murder; [and] the effect of the improper prosecutorial statements was to focus the jurors on their role as community members," the combined effect of the errors did not "infect [ ] the trial with unfairness" or render petitioner's defense "far less persuasive than it might otherwise have been" such that it violated petitioner's due process rights. *Id.* (alteration in original) (citation omitted).

Cumulative error is more likely to be found prejudicial when the government's case is weak.  *See id.*; *see, e.g.*, *United States v. Preston*, 873 F.3d 829, 846 (9th Cir. 2017) (noting the government's "hinged almost entirely on [the victim's] testimony with "little additional proof to corroborate his allegations"); *Thomas*, 273 F.3d. at 1180 (noting that the only substantial evidence implicating the defendant was the uncorroborated testimony of a person who had both a motive and an opportunity to commit the crime); *Walker v. Engle*, 703 F.2d 959, 961-62, 968 (6th Cir.), *cert. denied*, 464 U.S. 951 (1983).  However, where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation.  *See Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011); *Demetrulias v. Davis*, 14 F.4th 898, 916 (2021); *Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002); *Fuller v. Roe*, 182 F.3d 699, 704 (9th Cir. 1999); *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996).  Similarly, there can be no cumulative error when there has not been more than one error.  *United States v. Solorio*, 669 F.3d 943, 956 (9th Cir. 2012).

Here, Petitioner's cumulative error claim fails for several reasons.  First, the government's case was substantial and multifaceted, relying on the victim's testimony, the testimony of a co-defendant's witness, and palm print analysis.  Second, the assumed errors did not create a "symmetry of error" bearing directly on the "heart of the defense's case." Of the assumed errors addressed above, only the trial court's limit on defense counsel's argument relating to the origin and timing of a photograph of Petitioner went to the heart of the defense theory.  But even then, Petitioner's counsel was not prevented from arguing that theory and in fact *did* argue it.  The other two instructional errors did not

1   result in the admission or exclusion of evidence going directly to the heart of Petitioner's

2   case and involved alleged errors that the state appellate court reasonably found were

3   harmless considering other jury instructions given. Considering the alleged underlying

4   claims of error, this is not one of those rare cases involving a "unique symmetry" of errors,

5   all amplifying the prejudice caused by the other and all bearing directly on the sole

6   contested issue at trial.

7        The Court finds that the trial court errors, even when considered cumulatively, did

8   not render Petitioner's defense "far less persuasive than it might [otherwise] have been"

9   nor did the combined effect of the errors have a "substantial and injurious effect or

10  influence on the jury's verdict." *See Parle*, 505 F.3d at 927-28 (alteration in original)

11  (citation omitted). The state court's rejection of Petitioner's cumulative error claim was

12  neither contrary to, nor involved an unreasonable application of, clearly established federal

13  law, as determined by the United States Supreme Court. Petitioner is thus not entitled to

14  habeas relief.

15       **6.   Stay Imposition of Sentence**

16            **a.   Relevant Facts**

17       In his final claim, Petitioner contends the trial court erred when it failed to stay his

18  sentence on the human trafficking count because it was part of an indivisible course of

19  conduct with the forcible penetration and torture counts.  Dkt. No. 6-1 at 31-33).  The state

20  appellate court reported the relevant facts as follows:

21            The court sentenced Mitchell to 45 years to life in prison,
            comprised of consecutive sentences on count 4 (penetration with
22            a foreign object acting in concert), count 7 (human trafficking),
            and count 3 (torture). Mitchell argues the court erred by failing
23            to stay imposition of sentence on count 7 because that crime
            shared the same "intent and objective" as the torture and forcible
24            penetration.

25  *Mitchell*, 2019 WL 2098789, at *10.

26            **b.  State Appellate Court's Rejection of Claim**

27  Case No. 20-04294 BLF (PR)

28  ORDER DEN. PET. FOR WRIT OF HABEAS CORPUS; DEN. CERTIFICATE OF APPEALABILITY

United States District Court
Northern District of California

The state appellate court disagreed, holding that the counts did not share the same

intent and objective and therefore were not part of an indivisible course of conduct:

> Section 654 prohibits multiple punishment for different offenses committed with a single intent or objective. "[I]f all of the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, defendant may be found to have harbored a single intent and therefore may be punished only once. [Citation.] [¶] If, on the other hand, defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' " (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)

> "Whether a particular offense is part of a course of conduct for purposes of section 654 is a question of fact. [Citation.] In the absence of an explicit ruling by the trial court ... [appellate courts] infer that the court made the finding appropriate to the sentence it imposed, i.e., either applying section 654 or not applying it." (*People v. Mejia* (2017) 9 Cal.App.5th 1036, 1045; *People v. Alford* (2010) 180 Cal.App.4th 1463, 1468.) "A trial court's implied finding that a defendant harbored a separate intent and objective for each offense will be upheld on appeal if ... supported by substantial evidence." (*People v. Blake* (1998) 68 Cal.App.4th 509, 512.)

> We conclude substantial evidence supports the implied conclusion that defendants harbored separate intents and objectives for counts 3 (torture) and 7 (human trafficking). The prosecution theory was the torture occurred when Booker and another man cut Doe with a machete. Torture requires "the intentional commission of one or more assaultive acts ... committed with the intent to cause cruel or extreme pain and suffering." (*People v. Mejia*, *supra*, 9 Cal.App.5th at p. 1044.) Here, the evidence supports a conclusion that Booker and the other man tortured Doe for sadistic enjoyment. Mitchell's statement that Doe "should have just been a ho[ ]" also supports an inference he aided and abetted Booker's intent to take retribution on Doe for refusing to work for Booker previously. The objective in committing the human trafficking was distinct: to force Doe to prostitute herself. (*People v. Halim*, *supra*, 14 Cal.App.5th at p. 643.)

> Because the trial court could reasonably discern multiple and independent criminal objectives for counts 3 and 7, section 654 did not preclude imposition of consecutive sentences. (*See People v. Beman* (2019) 32 Cal.App.5th 442, 444 [section 654 did not bar punishment for conspiracy to commit human trafficking and substantive offense of human trafficking in part

United States District Court
Northern District of California

because "defendant's conspiracy to commit human trafficking had broader objectives" than the substantive offense]; *People v. Mejia, supra,* 9 Cal.App.5th at pp. 1046, 1047 [criminal threats were not necessary to, nor "committed in furtherance of the crime of torture"].)

Mitchell claims human trafficking (count 7) and penetration by a foreign object acting in concert (count 4) shared the same intent and objective: "to aid and abet Booker in engaging Doe in prostitution." We disagree. Booker put his gun in Doe's vagina and threatened to kill her if she screamed, suggesting his objective in committing this offense was to dissuade Doe from calling for help or reporting the incident, or to achieve sexual gratification. The trial court could reasonably discern different criminal objectives for the human trafficking and the foreign penetration, a gratuitous act of violence separate from the human trafficking. (*People v. Pearson* (2012) 53 Cal.4th 306, 333 [no violation of section 654 because "two separate, individually punishable criminal acts were committed"]; *People v. Assad* (2010) 189 Cal.App.4th 187, 201 [no error in imposing separate punishment on inflicting corporal injury and torture]; *People v. Perez* (1979) 23 Cal.3d 545, 552 [cautioning against defining a criminal objective so broadly as to encompass a string of separate crimes]; *People v. Saffle* (1992) 4 Cal.App.4th 434, 448 [sentencing for sodomy, digital penetration, and false imprisonment arising out of attack on same victim did not violate section 654].)

*Mitchell,* 2019 WL 2098789 at *10-11.

### c. Analysis

As explained above, a writ of habeas corpus can only be granted for a violation of federal law. Whether the trial court violated California Penal Code § 654 in sentencing Petitioner is a matter of state law which this court cannot reach. Accordingly, Petitioner is not entitled to habeas corpus relief as to this claim.

## IV. CONCLUSION

After a careful review of the record and pertinent law, the Court concludes that the Petition must be **DENIED**.

Further, a Certificate of Appealability is **DENIED**. *See* Rule 11(a) of the Rules Governing Section 2254 Cases. Petitioner has not made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Nor has Petitioner demonstrated that "reasonable jurists would find the district court's assessment of the constitutional

claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure.  *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

      The Clerk shall terminate any pending motions, enter judgment in favor of Respondent, and close the file.

      **IT IS SO ORDERED**.

Dated:_____July 11, 2022_____

BETH LABSON FREEMAN
United States District Judge